UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| MICHAEL MOTSINGER, DAVID WILSON, RONALD CORREIA, and JOSHUA SHRADER, | |
| Plaintiffs, | FIRST AMENDED COMPLAINT |
| v. | Case No. 5:26-CV-65-D |
| WILLIAM MORRIS III, MORRIS & ASSOCIATES, INC., a North Carolina Corporation, and THE ADMINISTRATIVE COMMITTEE OF MORRIS & ASSOCIATES, INC., RANDY CLAPSADL, AND BOB WARWICK | |
| Defendants. | |

## FIRST AMENDED COMPLAINT

1.      Plaintiffs Michael Motsinger, David Wilson, Ronald Correia and Joshua Shrader, by and through counsel, sue for breach of fiduciary duty and benefits due them under the terms of the Morris & Associates, Inc. Employee Stock Ownership Plan (the "Plan" or "ESOP"). They name as defendants Morris & Associates, Inc. ("Morris" or the "Company"), the Administrative Committee of Morris (the "Committee"), William Morris III, member of the Committee and Board of Directors, and ESOP Trustees Randy Clapsadl, Dorris Morris, and Bob Warwick, for refusal to pay benefits due under an employee benefits plan and other violations of the Employee Retirement Income Security Act of 1974.

## JURISDICTION AND VENUE

2. This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"). This Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and original jurisdiction pursuant to 28 U.S.C. § 1331.

3. The ERISA statute, 29 U.S.C. § 1133, and the Department of Labor regulations, 29 C.F.R. § 2560.503–1, provide a mechanism for administrative or internal appeal of benefits denials. In this case, those avenues of appeal have been exhausted, and this matter is now properly before this Court for judicial review.

4. Venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District, because some or all the events or omissions giving rise to the claims occurred in this District, and because a defendant resides or may be found in this District. The Plan is administered in Garner, North Carolina, where Defendant Morris is headquartered.

## DEFENDANTS

5. Defendant Morris is the Plan Sponsor and Plan Administrator under the Plan (Sec. 2.07), and is located in Wake County, North Carolina.

6. The Plan Administrator is required under the Plan and under 29 C.F.R. § 2560.503–1(f)(1) to make a prompt determination about any claim submitted to it. Under § 13.11 of the Plan, the Plan Administrator must make its determination and furnish it to a claimant within thirty days, including "(i) the specific reason or reasons for the denial; (ii) specific references to pertinent Plan

provisions on which the denial is based; (iii) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and (iv) an explanation of the Plan's claim review procedure."

7. Defendant Administrative Committee is a committee appointed by the Board of Directors of Morris to administer the Plan and to give instructions to the Trustee. Ex. 1, § 2.13. The Committee has sole responsibility for determining the rights of Participants and Beneficiaries under the Plan, directing the Trustee in the distribution of Trust assets, and administering the Plan in accordance with its terms. Ex. 1 § 11.03. Under Section 13.11 of the Plan, the Committee is required to "fully and fairly review the decision" of the Plan Administrator to deny any claim and to "make its decision regarding the merits of the claim promptly, and within thirty (30) days following the receipt by the Plan Administrator of the request for review" unless additional time is sought. The Committee's decision must "set forth specific reasons for the decision, shall be worded in a manner calculated to be understood by the claimant, and shall cite specific references to the pertinent Plan provisions on which the decision is based." Ex. 1, § 13.11.

8. Defendant William Morris III ("Bill Morris") is a member of the Plan's Administrative Committee and, upon information and believe, was the sole member of that Committee at the time Plaintiffs' Claims were denied through inaction.

9. Defendant Bill Morris lives in Wake County, North Carolina.

10. Defendant Dorris Morris is Bill Morris's wife and is a Trustee of the ESOP.

11. Randy Clapsadl is Bill Morris's son-in-law and is a Trustee of the ESOP and the Company's President. He was a Company officer throughout the Relevant Period, previously as the Company's Executive General Manager, Senior Vice President, and Chief Revenue Officer (CRO).

12. Randy Clapsadl is married to Sarah M. Clapsadl, a shareholder of Morris common stock, the Company's Secretary and Senior Accounting Manager, and the daughter of Bill Morris, who is himself the CEO and the second largest shareholder of Morris common stock, behind only the ESOP itself.

13. Defendant Bob Warwick is, following his recommendation by Bill Morris, a Trustee of the ESOP.

14. Defendants Warwick, Clapsadl, and Dorris Morris, as Trustees of the ESOP, were obligated by the Plan to determine the fair market value of ESOP shares as od December 31, 2022 (the "2022 Valuation"), December 31, 2023 (the "2023 Valuation"), and December 31, 2024 (the "2024 Valuation").

15. The Trustees are responsible for commissioning annual valuations of the Morris stock owned by the Plan. Under the Plan and ERISA, the Trustees must determine the fair market value of the Plan in good faith. Plaintiffs and other Plan participants are paid for the Morris stock in their Plan accounts after separation from service based on the fair market value set by the Trustees.

## PLAINTIFFS AND THEIR BENEFITS

16. Under the Plan, employees of Morris are compensated for their work, in part, by the award of shares of Morris in the ESOP.

17. Participants are allowed, and in some cases required, to sell their shares after they leave their employment at Morris, approach retirement age, or in certain limited other circumstances.

18. Because shares of Morris are not traded on a generally recognized market, they are valued annually and all participants selling ESOP shares the following year are paid the share price determined by the Trustees. Pursuant to the Plan Document and the requirements of ERISA, the annual valuation must reflect "the fair market value as of the Valuation Date." Plan Document § 2.48 ("the Trustee shall value the Plan assets at their fair market value as of the Valuation Date") (attached hereto as Exhibit 1).

19. Fair Market Value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551 (1973); *see also, Estate of Godley v. Comm'r of Internal Revenue*, 286 F.3d 210, 214 (4th Cir. 2002). Similarly, the Summary Plan Description requires that the "value of the Company Stock held by the ESOP reflects the earnings, assets, and growth of our Company".

20. Plaintiff Michael Motsinger sold approximately 2,052.8 shares in the ESOP on December 12, 2023 based on a share price that should have reflected the fair market value of Morris as of December 31, 2022.

21. Plaintiff Ronald Correia sold approximately 1,640 shares in the ESOP in December 2024 based on a share price that should have reflected the fair market value of Morris as of December 31, 2023.

22. Plaintiff Correia lives in Johnston County, North Carolina.

23. Plaintiff David Wilson sold approximately 927 shares in the ESOP in December 2024 based on a share price that should have reflected the fair market value of Morris as of December 31, 2023.

24. Plaintiff Wilson lives in Carteret County, North Carolina.

25. Plaintiff Joshua Shrader sold approximately 157 ESOP shares in August 2023 based on a share price that should have reflected the fair market value of Morris as of December 31, 2022.

26. Plaintiff Shrader lives in Durham County, North Carolina.

### THE 2022 VALUATION

27. The 2022 Valuation was determined in 2023 based on the value of Morris on December 31, 2022.

28. The 2022 Valuation understated the fair market value of Plaintiffs' shares, predominantly because it did not include the value of Morris' largest asset at the time, its $56,529,203 in cash and cash equivalents. *Johns v. Morris*, No. 5:23-cv-324, Dkt No. 68-2 filed Dec. 16, 2024 (attached hereto as Exhibit 2). After

excluding the value of the cash and cash equivalents, the 2022 Valuation calculated Morris' entire enterprise value as $24,047,000 and per share value as $234.60.

29. Cash has value. A dollar is worth a dollar. $56,529,203 in cash is worth $56,529,203.

30. However, Bill Morris insisted that the cash was not "excess cash" to be included in the valuation and the Trustees accepted, without questioning, the resulting undervaluation.

31. The Trustees either understood, or should have understood, that a profitable company with over $56 million in cash assets (and whose other assets exceeded its liabilities) should have a fair market value above $24,047,000.

32. If the cash had been valued, Morris would have been valued at over $80.5 million, producing a share price of $786.10 instead of $234.60.

### THE 2023 VALUATION

33. The 2023 Valuation was determined in 2024 based on the value of Morris on December 31, 2023.

34. The 2023 Valuation understated the fair market value of Plaintiffs' shares, predominantly because it did not include the value of Morris' largest asset at the time, its $71 million in cash and cash equivalents. *Johns v. Morris*, No. 5:23-cv-324, Dkt No. 68-2 filed Dec. 16, 2024 (Ex. 2 hereto). Excluding the value of Morris' cash position, shares were incorrectly valued at $360. Had the $71 million been included in the 2023 Valuation, the valuation of each share of Morris stock would have been $1,052.67.

35.     Cash has value. A dollar is worth a dollar. $71 million in cash is worth $71 million.

36.     The Trustees either understood, or should have understood, that a profitable company with over $71 million in cash assets (and whose other assets exceeded its liabilities) should have a fair market value above that used in the 2023 Valuation.

37.     By valuing Morris without valuing Morris' cash, the share price was more than $692 lower than the fair market value, harming each Plaintiff and every other plan participant who sold shares at the 2023 Valuation.

## THE 2024 VALUATION

38.     Upon information and belief, Defendants caused the 2024 valuation to exclude the value of cash and cash equivalents even though such assets should have been included in the valuation and would have increased the enterprise value by an amount at or near the cash value and the share price by approximately that amount less a 5% reduction for lack of marketability.

39.     The Trustees either understood, or should have understood, that a profitable company with tens of millions of dollars in cash assets (and whose other assets exceeded its liabilities) should have a fair market value above that provided for in the 2024 Valuation.

## DENIAL OF PLAINTIFFS' CLAIM AND REVIEW

40.     Section 13.11 provides that "[i]f a Participant or Beneficiary believes that he is entitled to benefits under the Plan which are not being paid to him… he

may file a written claim with any officer of the Employer or any member of the Committee. Such claim shall be immediately referred to the Plan Administrator, and the Plan Administrator shall decide whether the claim shall be allowed or denied in whole or in part."

41. On March 7, 2025, Plaintiffs Motsinger and Correia filed claims pursuant to the Plan's claim procedures. On April 9, 2025, Plaintiff Wilson did likewise. All three claims were submitted to Randy Clapsdl, an officer of Morris, as required by the Plan.

42. Pursuant to Section 13.11, the Plan Administrator had thirty days to provide a ruling on the claim. The Plan Administrator never did so.

43. Pursuant to Section 13.11, following denial of a claim or lack of response to a claim, Plaintiffs were entitled to appeal to the Committee. "The Committee shall fully and fairly review the decision denying the claim" and was required, within 30 days, to "deliver the decision to the claimant in writing. Such decision shall set forth specific reasons for the decision, shall be worded in a manner calculated to be understood by the claimant, and shall cite specific references to the pertinent Plan provisions on which the decision is based."

44. Plaintiffs provided their appeal to the Committee on June 4, 2025. The Committee did not provide a substantive response to Plaintiffs' claims nor did it attempt to justify the decision not to include Morris' cash and cash equivalents in the 2022 and 2023 Valuations.

45. Plaintiff Joshua Shrader has not separately submitted a claim, and need not do so because it would be futile given Defendants' non-response to the other Plaintiffs with identical claims and Plaintiffs' fiduciary breach claim does not require exhaustion.

FACTUAL ALLEGATIONS

**Company and Plan Background**

46. Headquartered in Garner, North Carolina, Morris Inc. designs and manufactures high performance chilling, refrigeration, and ice production equipment. It has approximately 130 permanent employees in the United States, as well as approximately 20 contract employees working in the United States and internationally. As of December 31, 2021, 123 current and former employees participated in Morris Inc.'s ESOP, and the beneficiaries of a deceased participant were receiving or entitled to receive benefits.

47. Morris Inc. was founded by W.F. Morris, Jr., L.R. Gorrell, and A.L. Purrington, Jr. (the "Founders"), and incorporated in North Carolina in January 1949, as Morris and Gorrell, Inc. The 2002 retirement of W.F. Morris, Jr. triggered the 2003 reorganization of the company from an S-Corp to a C-Corp and the formation of the ESOP to acquire Morris Inc. common stock from W.F. Morris, Jr. and C.R. Farinholt, while leaving Defendant Bill Morris with a controlling ownership interest. Beginning in 2003, the Plan periodically purchased shares of the Company, becoming the majority shareholder in 2010.

48. The effective date of the Plan was January 1, 2003. The Plan has been periodically amended through resolutions by the Board. For purposes of the

allegations herein concerning the Relevant Period, the effective plan document is the Morris & Associates, Inc. Employee Stock Ownership Plan as Amended and Restated, which was effective on January 1, 2017, and executed on January 27, 2017 (hereafter, the "Plan Document"). The Trust Agreement was made January 19, 2011, to create the ESOP Trust. The Plan includes the Plan Document as well as the Trust Agreement, unless the context indicates otherwise. Plan Doc. § 2.37.

49.     The Plan is intended to be an employee stock ownership plan, or ESOP, within the meaning of 26 U.S.C. § 4975(e)(7) and 29 U.S.C. § 1107(d)(6). By its terms, "[t]he Plan is designed to invest primarily in Company Stock," and its purpose "is to enable participating Employees to share in the growth and prosperity of the Company, and to provide Participants with an opportunity to accumulate capital for their future economic security." Plan Doc. § 1.01. The Plan is an "individual account plan" or "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), and an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2).

50.     Under the Plan Document, "All … Plan assets will be held in the Trust by the Trustee in accordance with the provisions of the Trust Agreement," and said Trustee is "[t]he person(s) or other entity designated by the Board (and any successor Trustee) which agrees to serve by executing the Trust Agreement." Plan Doc. §§ 1.04, 2.47. The Plan provides that the Trustee has "the sole responsibility" to value Plan assets in the Plan's trust at fair market value. Plan Doc. §§ 2.48, 11.03. Where, as here, there is no generally recognized market for the stock of the

privately-held Morris Inc., "the determination of fair market value of Company Stock for all purposes under the Plan shall be made by the Trustee based upon the value determined by an independent appraiser that meets the requirements similar to the requirements of the Treasury Regulations prescribed under Internal Revenue Code §170(a)(1) and who is recognized as having expertise in rendering such evaluations." Plan Doc. § 5.03.

51. The Plan's Named Fiduciaries are: "the Board of Directors of the Employer, the Committee, the Plan Administrator, and the Trustee." Plan Doc. § 11.01.

52. All current shareholders of Morris Inc. other than the Plan are relatives of the Founders. The Plan holds 73,134 shares (75.1% of all outstanding shares), and various Morris family members and family trusts hold and held in the Relevant Period all remaining shares (24.9% of Morris Inc. shares).

53. The Plan currently has three Trustees, two of whom are members of the Morris family, and the third of which a long-time business partner of Bill Morris.

54. Bill Morris was the CEO of Morris Inc. and the Chairman of Morris Inc.'s Board of Directors ("Board"). The other Board members at various times during the Relevant Period have been Bruce N. Bowers, Edgar W. Leonard, Blake D. Lovette, Samuel H. Maw, Robert M. Webb, John Shell, Ned Leary, and John Kimber. The Board has the power to remove and to appoint ESOP Trustees.

## The Plan's Fiduciaries Suffered From Numerous Conflicts of Interest

55. Morris Inc. is owned 75% by the ESOP and 25% by Defendant Bill Morris and his family. Although the ESOP is the majority owner of Morris, it has no control over anything.

56. There is no independent, external trustee. A majority of the Trustees were members of the Morris family — his wife and his son-in-law. The Plan administrator was Bill Morris, and the one Trustee who was not a member of the Morris family was a long-time friend of Bill Morris. A prior Trustee, Bryan Johns, was terminated after he questioned the undervaluation of ESOP shares during the 2022 Valuation.

57. The ESOP was purportedly managed by an "Administrative Committee" (consisting of Bill Morris) responsible for instructing the ESOP's Trustees (the "Trustees"). In practice, however, the Administrative Committee never met or existed. With no functional Administrative Committee, the ESOP was run by the Trustees.

58. Under ERISA and the Plan document, the ESOP Trustees were required annually to value the ESOP assets in the Plan's Trust at fair market value. During the Relevant Period (except for the 2023 valuation) these annual valuations were performed by John Sudol of Crescent Valuation Services, LLC. Every year when valuing Morris, Sudol asked Sarah Clapsadl, Bill Morris's daughter, whether there was any "excess cash" in the company. Every year, Sarah Clapsadl would answer there was no "excess cash." As a result, Sudol would exclude all the Company's cash holdings from his valuation. These valuations set the share

price former Morris employees would be paid when they tendered their shares of Morris upon separation of service. The lower the valuation, the less money the Company would pay for the stock and the more cash the Company could keep under the control of Bill Morris for use by Bill Morris at his direction or for distribution to Bill Morris or the other minority shareholders should they choose the sell their shares or the entire enterprise.

59. The conflicts of interest detailed above caused the Plan's fiduciaries to repeatedly under value the Plan's Morris stock, as detailed below.

**The Mis-Valuation of the ESOP's Stock**

60. The Plan, consistent with ERISA, requires annual valuations by the Trustees to determine the "fair market value" of the Morris Inc. shares held in the ESOP Trust as of the valuation date. Plan Doc. §§ 2.48, 5.03, 11.03.

61. Annually, Bill Morris hired Crescent Valuation Advisors, LLC ("Crescent") to appraise the value of the ESOP's common stock interest in the Company. In each case, the valuation was done by John J. Sudol. Crescent's engagement letters were sent to "Mr. William F. Morris, III, ESOP Trustee" even after Bill Morris resigned and was replaced as a Plan Trustee and had no authority to engage a valuator for the Plan. Nonetheless, Bill Morris signed Crescent engagement agreements. Bill Morris usurped the Trustees' responsibility and functioned as a discretionary Plan fiduciary after his replacement as Trustee.

62. In preparing his valuations, Sudol discussed and reviewed the Company's financial statements, future earnings and capital expenditure projections, and valuation assumptions for the ESOP only with Bill Morris and Bill

Morris's daughter, Sarah Clapsadl. Sudol did not receive or consider any information or materials from anyone at the Company other than these two individuals.

**Bill Morris Repeatedly Caused the ESOP to Undervalue its Morris Inc. Stock**

63.     Crescent was engaged by Bill Morris, acting as Trustee to the ESOP even after his replacement in November 2018, to value the Morris Inc. stock held by the Plan annually during the Relevant Period.

64.     To gain an understanding of the operations of Morris Inc., John J. Sudol, Managing Member of Crescent, met with Bill Morris on June 23, 2015, for a site visit of the Company's operations.

65.     After the 2015 site visit, neither Sudol, nor anyone else at Crescent, visited Morris Inc. As a condition of Crescent's engagement, the ESOP's Trustees and the Company, of which the ESOP owned a majority of shares, were required to provide all information relating to Morris Inc. necessary for purposes of Crescent providing its "opinion of the fair market value of the ESOP's single share to the Trustees." In providing the valuations, Crescent assumed the accuracy, reliability, and completeness of all information, which was furnished by Bill Morris and Sarah Clapsadl, without any independent verification, audit, or review.

66.     During related litigation, Sudol testified that no one would sell the Company's stock in an arm's-length transaction with all the cash held by the Company. In other words, Sudol conceded that excluding the cash from the Company's equity value determination and the determination of the value of the

stock conflicted with the fair market value definition which requires hypothetical sellers and buyers.

**COUNT I: Recovery of Plan Benefits Pursuant to 29 U.S.C. § 1132(a)(1)(B)**

67. Plaintiffs re-allege, as if fully set forth herein, each and every prior allegation contained in paragraphs 1 to 66 contained above, and further allege the following against Defendants:

68. Under the terms of the Plan, Plaintiffs were entitled to sell their shares of Morris at the "fair market value as of the Valuation Date." See, Ex. 1, §§ 2.48, 5.02, 5.03, 5.04.

69. The "fair market value" must be determined "in good faith" and reflect Morris' "condition and prospects, financial and otherwise, generally used in the determination of the fair market value of corporate stock of comparable public or private companies engaged in the same or similar industries." Ex. 1, § 5.03.

70. By entirely ignoring Morris' extremely large cash holdings when determining the price to value Plaintiffs' shares, Plaintiffs did not receive the benefit they were entitled to when selling their shares.

71. Defendants failed to provide benefits due under the terms of the Plan, and this denial of benefits to Plaintiffs constitute a breach of the Plan.

72. The decision to deny benefits was incorrect under the terms of the Plan.

73. The decision to deny benefits and the decision-making process was arbitrary and capricious, if it existed at all.

74. The decision to deny benefits was not supported by any evidence on the record, let alone substantial evidence. Meanwhile, Plaintiffs provided ample evidence, including an expert valuation report, that the share price they received was far below the fair market value of their shares.

75. As a direct and proximate result of the aforementioned conduct of the Defendants in failing to provide benefits due under the Plan, Plaintiffs have been damaged in the amount equal to the amount of benefits to which they would have been entitled under the Plan.

76. As a direct and proximate result of the aforementioned conduct of the Defendants in failing to provide benefits for Plaintiffs as provided for by the Plan, Plaintiffs have suffered damages under the Plan, plus interest and other damages, for a total amount to be determined.

## COUNT II – Breach of Fiduciary Duty Under ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3) Against the Trustee Defendants and William Morris, III

77. Plaintiffs re-allege, as if fully set forth herein, each and every prior allegation contained in paragraphs 1 to 76 contained above, and further allege the following against Defendants:

78. Plaintiffs sue under This action is brought on behalf of the Plan and for relief to the Plan under Sections 404 and 502(a)(3) of ERISA, 29 U.S.C. §§ 1104, and 1132(a)(3), for equitable and injunctive relief to cure Defendants' breaches of fiduciary duty in violation of ERISA. Such relief includes removing the Trustees, enjoining the Trustees from acting as named or functional fiduciaries for the Plan, appointment of independent Trustee, and enjoining the independent Trustee to

determine anew the fair market value of the Morris stock tendered to Morris by Plaintiffs.

79.     The Trustee Defendants were obligated by their ERISA fiduciary obligations to "discharge his duties with respect to [the] plan solely in the interest of the participants and beneficiaries"; for the purpose of "providing benefits to participants and their beneficiaries"; and with the "care, skill, prudence, and diligence" required to ensure they receive the benefits to which they are due. 29 U.S.C. § 1104(a)(1).

80.     The Trustee Defendants are Bill Morris's wife Doris, who is a shareholder and Payroll Manager at the Company; Bill Morris's son-in-law Randy, who is President of the Company; and Bill Morris's long-time business partner Bob Warwick. They are a conflicted group not acting in the interest of the participants and beneficiaries of the ESOP, which is the majority shareholder of the Company, but in the interest of Bill Morris and the Morris family, who are minority shareholders but maintain firm control over the Company and the ESOP.

81.     The ESOP's Company stock was undervalued in 2022, 2023 and 2024 due to Defendants' breaches of ERISA because, *inter alia*, Morris Inc. has a large amount of cash that, at Bill Morris's direction, was not factored into the value of the stock by the valuator Bill Morris hired. The Plaintiffs have been injured due to the undervaluation of stock they were shortchanged of their pension benefits upon cashing out of the Plan on separation from service.

82. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires, *inter alia*, that a plan fiduciary discharge his or her or its duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan and defraying reasonable expenses of administering the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with ERISA.

83. The fiduciary duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

84. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits plan participants, beneficiaries, and fiduciaries to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

85. Trustee Defendants were required to undertake appropriate and independent investigations of the fair market value of Morris Inc. stock to fulfill their fiduciary duties, and an appropriate investigation would have revealed that

the valuations made by Crescent did not reflect the fair market value of the Morris Inc. stock owned by the Plan.

86. Trustee Defendants as fiduciary Trustees, and Defendant Morris Inc. as the Plan Administrator, and Bill Morris, who supplied information to Crescent, had a duty to provide the valuator complete and accurate information to conduct the valuations. Defendants failed to do so.

87. Trustee Defendants had the responsibility and duty to value the Plan's stock, investigate the valuator's qualifications, hire a qualified valuator, provide the valuator with complete and accurate information, and make certain that reliance on the valuator's advice was reasonably justified under the circumstance. But Trustee Defendants failed to do so. Bill Morris controlled and directed the supply of information from the Company to Crescent, directly and through his daughter, Sarah Clapsadl, on which the valuator undervalued the Company. Trustee Defendants did not meet their duties of care, skill, prudence, diligence, and loyalty to the Plan and its participants and beneficiaries.

88. Trustee Defendants had a duty of loyalty under which they should have discharged their duties with respect to the ESOP solely in the interest of its participants and beneficiaries. Instead, they allowed the interests of Bill Morris and the Morris family to interfere with their duties, allowing Bill Morris to largely work alone on valuation, and at times with his wife, son-in-law, and daughter, with the undervaluation of ESOP's stock as a result.

89. Defendants breached their fiduciary duties under 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D).

<u>PRAYER FOR RELIEF</u>

Wherefore, Plaintiff prays for judgment against Defendants and for the following relief:

A. Declare that Defendants breached their fiduciary duties under ERISA;

B. Order the removal of any of the breaching fiduciaries from their positions as fiduciaries for the Plan and enjoin any of the breaching fiduciaries from acting as fiduciaries for any plan that covers any Morris Inc. employees;

C. Appoint independent Plan trustees to act as ESOP Trustee and, as majority shareholder, to replace the incumbent and conflicted Board and Board Chairman with an independent Board and Chairman, to the extent allowed by the Plan's 75.1% ownership interest;

D. Enjoin the independent ESOP Trustee to undertake new fair market value determinations as of the dates the value of Plaintiffs' Morris stock was determined;

E. Order the Company to pay Plaintiffs additional benefits pursuant to the fair market value determinations made by the Independent ESOP Trustee;

F. Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to 29 U.S.C. § 1132(g);

G. Order Defendants to pay pre-judgment and post-judgment interest; and

H. Award such other and further relief as the Court deems equitable and just.

Dated: May 12, 2026

Respectfully submitted,

*/s/ Mark G. Boyko*
Alan B. Felts
J. Nathan Duggins III
**TUGGLE DUGGINS P.A.**
400 Bellemeade Street, Ste. 800
Greensboro, NC  27401
Telephone: (336) 271-5215
Facsimile: (336) 274-6590
AFelts@tuggleduggins.com
NDuggins@tuggleduggins.com

Gregory Y. Porter (*pro hac vice*)
Mark G. Boyko (*pro hac vice*)
**BAILEY & GLASSER LLP**
1055 Thomas Jefferson Street, NW, Ste. 540
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103
gporter@baileyglasser.com
mboyko@baileyglasser.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of May 2026, a copy of the foregoing document was served on all counsel of record via ECF.

*/s/ Mark G Boyko*
Mark G. Boyko